UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PENNY D. WALTER,

    Plaintiff,

vs.                                      Case No.

AETNA LIFE INSURANCE            HON.
COMPANY,

    Defendant.

___

Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:  616-235-2300
Facsimile:  616-459-0137
Email:  thaney@troyhaneylaw.com

___

# COMPLAINT

Plaintiff, Penny D. Walter, by her attorney, Troy W. Haney of Haney Law Office, P.C., and for her complaint against Defendant, Aetna Life Insurance Company, states as follows:

## Nature of Action and Jurisdiction

1. This is a civil complaint brought by Plaintiff, Penny Walter ("Plaintiff"), under the Employee Retirement Income Security Act ("ERISA"), §502, 29

U.S.C. 1132, regarding breach of the terms of an employee benefit plan and breach of fiduciary duties, for the purpose of compelling Defendant to provide certain disability insurance benefits in amounts and at the coverage levels promised and for an accounting, recovery of damages, costs, and attorney fees incurred as a consequence of Defendant's breaches of its obligations and duties under ERISA as detailed herein.

2. This Court has subject jurisdiction over Plaintiff's claims pursuant to ERISA §502(e) and (f), 29 U.S.C. 1132(e) and (f) and 28 U.S.C. 1331.

3. Venue properly lies in this District pursuant to ERISA §502(e)(2), 29 U.S.C. 1132(e)(2).

**Parties and General Allegations**

4. At all relevant times, Plaintiff was a participant, as defined by ERISA §3(7), 29 U.S.C. 1002(7), in the "Long Term Disability" Plan ("the Plan") provided by AutoZone, Inc. ("AutoZone"), to its eligible employees, including the Plaintiff, administered by The Hartford Financial Services Group, Inc. ("The Hartford") and funded by an insurance policy issued by Aetna Life Insurance Company ("Aetna") to AutoZone, for group disability benefits as group policy no. GP-866266-GI.

5. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA §3(1), 29 U.S.C. 1002(1), sponsored by AutoZone and

2

funded by the above-referenced insurance policy issued by Aetna. As such, Aetna is the proper party to defend this matter and the sole entity responsible for the payment of claimed benefits set forth below.

6. At all relevant times, Defendant was the fiduciary of the Plan within the meaning of ERISA §3(21), 29 U.S.C. 1002(21), in that Defendant acted as a fiduciary for the Plan and exercised authority and control over the payment of long term disability "LTD" benefits, which are assets of the Plan. Pursuant to 29 C.F.R. §2560.503-1(h)(1), Defendant, therefore, functioned as a fiduciary for claims procedure purposes.

## Facts

7. At all relevant times the Plaintiff was employed full-time by AutoZone, Inc. as a Store Manager, until her last day of work on May 14, 2016, due to a pre-scheduled right-side total knee replacement.

8. Unfortunately, the Plaintiff's surgery was not entirely successful, and she continued to have pain in both of her knees. The Plaintiff has also been diagnosed with the following medical conditions:

    - Arthritis, bilateral feet
    - Arthroplasty, right knee (total), left knee (partial)
    - Bilateral knee pain
    - Carpal Tunnel Syndrome, bilateral
    - Chronic Back Pain
    - Chronic Obstructive Pulmonary Disease ("COPD")

- Degenerative Arthritis, Lumbar and thoracic spine
- Diabetes
- Endplate spurring along thoracic spine
- Facet Arthrosis, lumbar
- Medial Meniscectomy, left knee (partial)
- Numbness, bilateral hands
- Neuropathy, bilateral feet
- Spurring, bilateral feet
- Sleep Apnea
- Tricompartmental Osteoarthrosis, left knee

9. Due to the above-described medical conditions and the associated symptomatology, the Plaintiff is not able to sit, stand, or walk for extended periods of time, she can never bend, kneel, crouch, balance, or drive, and she is not able to perform fine manipulation, gross manipulation, and reaching above or below shoulder level. The Plaintiff also has constant neck pain that travels into her shoulders; mid-back pain that is constant and sometimes travels into her legs; constant tailbone pain; constant wrist pain; and bilateral knee pain and foot pain that comes and goes, but becomes worse with walking. The Plaintiff also uses a rescue-inhaler and long-term inhaler, often utilizes a cane for walking, and has difficulty using her hands due to numbness and will often drop items.

10. In accordance with her employment contract the Plaintiff applied for long term disability benefits, which were approved with an effective start date of August 15, 2016.

11. The "Test of Disability" within the Plan is as follows:

> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of your **adjusted predisability earnings**.
>
> **After the first 24 months of your disability** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition. (Emphasis in original).

12. The definition of "Own Occupation" within the Plan is as follows:

> The occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:
>
> - For your specific employer; or
> - At your location or work site; and
> - Without regard to your specific reporting relationship.

13. The definition of "Reasonable Occupation" within the Plan is as follows:

> This is any gainful activity:
>
> - For which you are, or may reasonably become, fitted by education, training, or experience; and
> - Which results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings**. (Emphasis in original).

14. Over the next two (2) years, the Defendant continued to pay the Plaintiff LTD benefits under the "Own Occupation" definition of disability.

15. On July 11, 2018, the Social Security Administration ("SSA") issued a favorable decision and granted the Plaintiff's claim for Social Security Disability Insurance ("SSDI") benefits, with an effective date of November 1, 2016.

16. On October 30, 2018, while completing a review of the Plaintiff's claim for continued LTD benefits under "Reasonable Occupation" definition of disability, the Defendant's LTD Team Leader, Emily Moody, noted within the Defendant's Claim File:

> In totality, [Mrs. Walter] has multiple co-morbid conditions that impact her overall daily function. Multi-site pain complaints. Unlikely to be able to perform sustained and consistent activities at a sedentary demand level. Based on chronicity and multiple issues involved, no significant clinical improvement is anticipated.

17. On October 31, 2018, the Defendant issued a notice to the Plaintiff that she had been approved for continuation of LTD benefits under the Reasonable Occupation definition of disability.

18. On January 7, 2020, Roger Morris, D.O. completed an Attending Physician Statement, which stated in part,

> **Medical Conditions Impacting Activity:**
> COPD; Diabetes; Sleep Apnea; Degenerative Arthritis Lumbar; Chronic Backpain; Arthritis Feet; Total Rt. Knee Arthroplasty; Carpal Tunnel Syndrome; Chronic Back & Extremity Pain, upper and lower.

6

>   **Expected Return to Work Date:** Not expected.
>
>   **Sit; Stand; Walk; Fine Manipulation; Gross Manipulation; Reach above shoulder; Reach below shoulder:** Not able.
>
>   **Bend at Waist; Kneel/crouch; Climb; Balance; Drive:** Never.
>
>   **Expected duration of any restrictions or limitations:** Life.

19. On January 27 and 28, 2020, the Defendant had covert surveillance conducted on the Plaintiff for eight (8) hours each day. Over the total surveillance period of sixteen (16) hours, the Plaintiff was almost entirely inactive outside of her home, and was only observed on the second day while she let her dog out.

20. On February 7 and 8, 2020, the Defendant had additional covert surveillance conducted on the Plaintiff for four (4) and eight (8) hours, respectively. On the first day, the Plaintiff was observed departing her residence as a passenger in a vehicle, and then surveillance was terminated due to the investigator losing track of the vehicle. On the second day, the Plaintiff was again observed departing her residence as a passenger in a vehicle, and then followed to a local high school. Approximately 9 minutes of video footage was obtained of the Plaintiff outside of the school while she stood and walked with another individual while in conversation, and also utilized a vaping device. The Plaintiff was not observed using any assistive devices throughout the available video footage.

21. On March 3, 2020, based on inconsistencies the Defendant believed to be present between the Plaintiff's reported level of disability, and the level of activity that had been observed during surveillance, the Defendant had an in-person interview conducted with the Plaintiff. The interview took place at a local library, and was conducted by a Mr. Tom Kohl, who included in his report the following:

- the claimant was observed to be walking with a cane and appeared to walk slower than normal with a limp.
- The claimant sat on an un-cushioned chair; however, several times throughout the interview, the claimant requested to stand and change position (as she reported sitting was causing her pain). During the interview (35 minutes in length), the claimant was observed shifting her position several times, appeared anxious, and vocalized she was uncomfortable.
- The claimant reported she does utilize a cane and walker to move or walk around. When questioned on the amount of time she will utilize the equipment, she stated she will use her cane 70% of the time and if she is in extreme pain, she may use the walker.
- The claimant was observed to ambulate slowly with a slight limp, and appeared dependent on a cane for mobility. When questioned on the duration she could walk, the claimant reported it would probably be approximately 15 to 20 minutes, and then she would be done for the day with walking.

22. On June 9, 2020, the Plaintiff's attending physician, Dr. Roger Morris, responded to a letter from the Defendant's Medical Case Manager, who questioned whether the Plaintiff could perform at a minimum level that would allow her to engage in "sedentary" occupation for 40 hours per week. Dr. Morris confirmed that the Plaintiff does not have that level of function, and further stated,

> Mrs. Walter has constant pain that is aggravated by sitting and bending forward associated with her degenerative vertebral arthritis. Hand function is limited especially fine dexterity [due to] carpal tunnel [symptoms] and she drops items easily [due to] pain in hands – she also requires PRN analgesics that might mentally affect her ability to function. Deconditioning is present [due to] her inability to exercise and be physically active as she might otherwise. No one will hire her with these issues.

23. On July 13, 2020, the Plaintiff underwent a left knee arthroscopy, with a partial medial meniscectomy.

24. As of August 15, 2020, the Defendant had paid LTD benefits to the Plaintiff for four (4) years, including two (2) years under the Reasonable Occupation definition of disability.

25. On October 13, 14, 28, and 29, 2020, the Defendant had additional covert surveillance conducted on the Plaintiff's residence. On October 13, surveillance was conducted for six (6) hours, and the only activity observed was the Plaintiff letting her dog out. On October 14, no activity was observed after three (3) hours, and surveillance was terminated. On October 28, the Plaintiff had a pre-scheduled medical appointment, and was observed entering a pickup truck using her left leg and left arm to pull herself up into the passenger seat, attending the medical appointment, and then returning to her residence. On October 29, no activity was observed over a four (4) hour period. Over the four-day period, the surveillance confirmed that the Plaintiff has an inactive lifestyle, and that she only departed her residence on one

occasion to attend a medical appointment that was scheduled by the Defendant.

26. On October 28, 2020, at the request of the Defendant, the Plaintiff attended an Insurance Medical Examination ("IME") with Marvin Bleiberg, M.D., who is a physical medicine and rehabilitation physician, with a subspecialty in pain medicine. Although Dr. Bleiberg confirmed many of the Plaintiff's medical conditions, he ultimately concluded that the Plaintiff could functionally perform full-time work by engaging in a combination of sitting, standing, and walking throughout the day. However, it should also be noted that although Dr. Bleiberg was consulted in part due to his subspecialty in pain medicine, he does not address how the Plaintiff's pain would affect her ability to perform in a full-time capacity.

27. On November 17, 2020, the Defendant requested Dr. Bleiberg to complete an addendum to his prior report in consideration of the recently acquired surveillance video from October 2020. In response to the additional surveillance footage, Dr. Bleiberg revised his recommended restrictions, shortening the recommended break period the Plaintiff would need after standing, and adjusting the total restriction on climbing to allow for "occasional" climbing. Notably, Dr. Bleiberg continued to omit any

discussion of the effects the Plaintiff's pain would have on her ability to perform in a full-time capacity.

28. On December 21, 2020, the Defendant had an Employability Analysis Report ("EAR") completed by an unnamed Vocational Case Manager ("VCM"). The VCM was requested by the Defendant to base its analysis solely on the restrictions provided in Dr. Bleiberg's November 17, 2020 addendum report. The VCM's report concluded that there were multiple positions that the Plaintiff could perform, and also claimed that these positions were in accordance with the Plaintiff's prior work experience. However, according to the report, even though Dr. Bleiberg supported a limitation on the Plaintiff's capacity to handle, finger, and feel to only an "occasional" basis, this was not considered as part of the EAR. It is also worth noting that rather than only using the Plaintiff's work-experience within the prior fifteen (15) years, as is the standard for such an evaluation, the VCM incorporated the Plaintiff's work experience going back a full thirty-three (33) years, all the way back to 1987.

29. On December 29, 2020, the Defendant issued a letter to the Plaintiff, notifying her that her LTD benefits were being terminated based on its conclusion that she no longer qualified as disabled under the "Reasonable Occupation"

11

definition of disability. The Defendant's decision was based in part on the surveillance, Dr. Bleiberg's addendum report, as well as the EAR.

30. It should also be noted that neither the IME report, nor the EAR, were provided to the Plaintiff for an opportunity to review and respond to the reports before the Defendant made its decision to terminate the Plaintiff's LTD benefits. Because the Defendant's decision to terminate the Plaintiff's LTD benefits was based on these reports, both should have been shared with the Plaintiff[1], as is required by the Claims Procedures for the Department of Labor, 29 C.F.R. § 2560.503-1(h)(4)(i), in order to be considered a full and fair review.

31. On January 14, 2021, without the assistance of counsel, the Plaintiff appealed the termination of her LTD benefits under the definition of disability for the Reasonable Occupation period. The Plaintiff's appeal stated in part,

> I disagree with your decision & also that of the IME (Dr. Marvin Neil Bleiberg). Dr. Bleiberg suggests that I can work a desk job, I disagree. I cannot sit for 2 hrs straight at a time, not even close. If I sat for 2 hours straight I would not even be able to walk, and my back would be in so much pain I would need a pain pill & lay down long before 2 hrs.
>
> I am unable to stand for 30 minutes at a time due to – too painful in legs, feet & back. * * *
>
> I cannot work with my hands & fingers for any length of time due to the bilateral Carpal Tunnel, nerve damage in the right hand & wrist. The Carpal Tunnel in the right hand travels to the right elbow and up

---

[1] The IME report was submitted to the Plaintiff's attending physicians for review, however, it was never shared with the Plaintiff before the decision to terminate benefits, as is required by the Department of Labor Claims Procedures.

12

      to the right shoulder & makes it very painful and cannot continue. * * *

      Dr. Bleiberg says I can click, I cannot click due to the Carpal Tunnel in my right & left hand. That motion sends pain all the way up to my shoulders, my wrist swells, it's also very painful. * * *

      I use a cane when my knee is locking and/or giving out. * * *

      Dr. Bleiberg says there was no pain of the cervical range of motion. There absolutely was pain & he could tell there was pain. Dr. Bleiberg is not a gentle doctor he just <u>pushes</u> your body the way he wants it to <u>bend</u>.

      Dr. Bleiberg said there was no pain during the Lumbar Range of Motion. There was pain and I told him so! He was so rough and pushed my body in the direction he wanted it to go and at one point I told him <u>to stop</u>! It <u>hurts</u>!! * * *

      When Dr. Bleiberg was checking my right knee he had me lay down on my back, he lifted my right leg & started pushing down on the right leg. The leg itself stop & wouldn't go any further and he kept applying more & more pressure on it. It hurt like hell & he kept it up – I told him it hurt.

      When I got back into my truck with my husband the tears of pain came.

      I am asking that you please review my case. <u>I do not feel</u> that my claim should [have] been closed. (Emphasis in original).

32. On February 9, 2021, the Defendant had a second Employability Analysis Report ("EAR") completed by Michelle Wheeler, a Vocational Clinical Case Manager. Ms. Wheeler was requested by the Defendant to base her analysis solely on the restrictions provided in Dr. Bleiberg's November 17, 2020 addendum report. Ms. Wheeler's EAR concluded that there were multiple positions that the Plaintiff could perform, and also claimed that these positions were in accordance with the Plaintiff's prior work experience. However,

13

according to the report, even though Dr. Bleiberg supported a limitation on the Plaintiff's capacity to handle, finger, and feel to only an "occasional" basis, this was not considered as part of Ms. Wheeler's evaluation. It is also worth noting that rather than only using the Plaintiff's work-experience within the prior fifteen (15) years, as is the standard for such an evaluation, Ms. Wheeler incorporated the Plaintiff's work experience going back a full thirty-three (33) years, all the way back to 1987.

33. On March 1, 2021, the Defendant had a paper-file review completed by Behzad Emad, M.D., who specializes in physical medicine and rehabilitation, as well as pain medicine. It should be noted that Dr. Emad did not speak with or examine the Plaintiff at any time, nor did he speak with any of the Plaintiff's attending physicians. Upon completion of his review, Dr. Emad supported a minimal level of restrictions and limitations due to the Plaintiff's multiple knee surgeries, but ultimately concluded that the Plaintiff could still engage in full-time work. It should also be noted that Dr. Emad based part of his decision to not support disability based on cervical, thoracic and lumbar spine, and bilateral wrist conditions due to the lack of abnormal findings through physical examination "*during the time period in question*" – however, the time period in question was essentially limited to January and February, 2021, for which there were no records even available for Dr. Emad to review.

34. On March 4, 2021, the Defendant sent Dr. Emad's report to the Plaintiff's attending physician, Dr. Morris, for an opportunity to review and respond to the report. On March 15, 2021, Dr. Morris provided a response to the report, stating in part,

> **What are the diagnoses causing impairment to this claimant?**
> Tricompartmental osteoarthrosis of left knee, total right knee arthroplasty, left knee with partial medial meniscectomy, chronic back pain greater that three months, COPD, bilateral foot pain, bilateral carpal tunnel disease.
>
> **Please discuss the claimant's current bilateral knee condition. Please state your objective findings.**
> Penny continues to have chronic knee pain that limits her from squatting, kneeling and even sitting for periods of time. The pain is reported as moderate to severe. She has limited extension and pain of her right knee.
>
> **Please discuss the claimant's current cervical/thoracic/lumbar spine and bilateral wrist condition. Please state your objective findings.**
> She also complains of chronic low back pain. X-ray findings of degenerative arthritis, disc space narrowing and facet arthrosis lumbar and arthritis of thoracic spine. She gives history of bilateral carpal tunnel disease and has difficulty with using her hands with numbness.
>
> **Does the claimant have reliable, sustainable capacity for full time work?**
> To summarize she has multiply faceted health issues that would classify her as totally disabled. It is clear with all of these issues that it would be extremely difficult for her to obtain employment.

35. On March 29, 2021, Dr. Emad issued an addendum to his initial paper-file review, based on the response letter provided from Dr. Morris, and revised his recommended level of restrictions and limitations to include consideration for her lumbar spine and bilateral wrist conditions, but still ultimately concluded

15

that the Plaintiff could still engage in full-time work within the provided restrictions.

36. On April 6, 2021, the Defendant had an Employability Analysis Report Addendum ("EARA") completed by Christie Pate, a Vocational Rehabilitation Case Manager. Ms. Pate was requested by the Defendant to base her analysis solely on the restrictions provided in Dr. Emad's March 29, 2021 addendum report, and did not consider any of the restrictions or limitations put in place by the Plaintiff's attending physicians. Ms. Pate's EARA ultimately concluded that there were multiple positions that the Plaintiff could perform.

37. On April 7, 2021, the Defendant sent copies of Dr. Emad's addendum report and the EARA to the Plaintiff for an opportunity to review and respond to the new records, and on April 13, 2021, the Plaintiff responded by providing copies of prior medical records that were supportive of her claim for disability.

38. On May 4, 2021, the Defendant advised that it was maintaining the decision to terminate the Plaintiff's LTD benefits. The decision stated in part,

> We completed our review of your Long-Term Disability (LTD) appeal and we have agreed with the original decision to terminate your benefit as of December 29, 2020. * * *
>
> It is not sufficient for an attending physician to issue restrictions without corroborating medical evidence or merely list symptoms as though they inherently imply a certain level of functional impairment. Thus, while Dr. Morris appears to maintain that you are unable to work, he failed to provide any current objective findings that support

>a sub-sedentary capacity. Although it is not unusual for a physician to rely on a patient's subjective symptoms when providing medical care, based on the medical evidence obtained, your reported restrictions and pain complaints appear to be somewhat out-of-proportion considering the limited clinical findings. * * *
>
>We acknowledge your reported difficulties; however, the objective medical evidence located in your file does not correlate with your self-reports. We have considered the arguments presented on appeal, but based on the great weight of the evidence available for review, we are unable to reverse our position on the matter. We have determined the available record fails to support that you remained Disabled from Any Reasonable Occupation as defined by the Policy from 12/29/20 ongoing, and your claim file remains closed.

39. In the May 4, 2021 final denial letter, the Defendant also informed the Plaintiff that "*since we've made our final decision, no other action will be taken by us*" and that the Plaintiff "*can file a lawsuit under section 502(a) of a law called ERISA.*"

40. As a result of the aforementioned wrongful actions, the Plaintiff's group waiver of life premium may have also been wrongfully denied by operation of the decision to terminate her long term disability benefits.

### COUNT I
### Claim for Benefits Pursuant to ERISA §502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) against Defendant

41. The Plaintiff incorporates paragraphs 1 through 40 above as if fully restated herein.

42. ERISA §502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to

17

enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

43. The failure to pay full disability benefits as described above are in direct violation of the terms of the Plan.

44. The Plan has failed to pay disability benefits to the Plaintiff despite the recommendations of his physicians and disabling medical conditions.

45. The failure and refusal of the Plan to pay the benefits owed the Plaintiff under the Plan is a breach of the terms and provisions of the Plan.

46. In addition, the Plan has failed to properly and thoroughly investigate the Plaintiff's claim in the manner required by ERISA's fiduciary and claims procedure requirements.

47. The actions of the Plan have caused damage to the Plaintiff in the form of the denial of long term disability benefits.

48. In addition, because the Plan denied the payment of the Plaintiff's long term disability benefits, the Plaintiff became ineligible for other benefits provided through her employment such as pension, medical benefits, and the waiver of group life insurance premiums.

**PRAYER FOR RELIEF**

Plaintiff requests that this Honorable Court grant the following relief:

A. A declaratory judgment pursuant to ERISA §502(a)(1)(B), 29 U.S.C. 1132 (a)(1)(B) and 28 U.S.C. 2201, declaring that the Plaintiff is entitled to the

      group employee benefits in the proper amounts as set forth in the Plan in effect at the time benefits became payable and that the Defendant has violated the Plan and its fiduciary duties by failing to pay these benefits.

B.      A full and accurate accounting by the Defendant of all computations for the Plaintiff's employee benefits, in sufficient detail so that the Plaintiff may ascertain that his benefits are being paid in the proper amount.

C.      An Order compelling the Defendant to pay the Plaintiff forthwith the full amount of employee benefits due to her and to continue such payments for the period set forth in the Plan, including interest on all unpaid benefits.

D.      An Order awarding reasonable attorney fees and costs pursuant to ERISA §502(g)(1), 29 U.S.C. 1132 (g)(1).

E.      Such other relief as may be just and appropriate.

Dated: November 17, 2021

*/s/ Troy W. Haney*
Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503